UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR406-333 |
| | ) | |
| DARREN N. WEHRLE, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a motion to suppress evidence recovered during a search of the vehicle in which he was riding as a passenger on June 24, 2006. Doc. 12. The Court held an evidentiary hearing on the matter on January 17, 2007, at which time the government offered testimony from Officer Alan Arflin of the Savannah-Chatham County Metropolitan Police Department and Denise Gibbons, a 911 dispatch operator with the police department. The government also introduced a recording of a 911 call that furnished the basis for the police decision to stop the vehicle. For the following reasons, defendant's motion to suppress should be DENIED.

I.  **BACKGROUND**

On June 24, 2006, around 11:45 p.m., Denise Gibbons received a call at the Savannah 911 center from a couple (later identified as Charles and Ruby Kirby) requesting that a patrol car be dispatched to investigate the occupants of a white Honda Accord, whom they had just observed with a firearm in the Kroger parking lot at McAlpin Square in Savannah.  Mr. Kirby described the vehicle's occupants as two young white males and relayed the vehicle's make, model, license tag number, and county of registration.  Mr. Kirby stated that while the vehicle was at the Kroger on Victory Drive, one of its occupants had stepped out of the vehicle with a firearm.  He stated that the individual had not brandished the weapon at anyone but had simply exited the vehicle briefly with the gun.  Mr. Kirby reported that before leaving the Kroger the vehicle stopped again "further out in the parking lot," where one of the occupants got out of the vehicle and urinated.  Mr. Kirby advised Ms. Gibbons that he was driving a large white Dodge van and was following the suspect vehicle along Victory Drive.

During the course of the 911 call, which lasted approximately ten minutes, Mr. Kirby followed the vehicle and relayed its location and other

details to Ms. Gibbons. At one point, Mr. Kirby reported that the driver of the vehicle had removed his shirt at an intersection and seemed to realize that he was being followed, for he then circled around into the Victory Bowling Center in an apparent effort to elude his pursuer. While she was on the line with Mr. Kirby, Ms. Gibbons announced over the dispatch radio that she had a complaint "advising that subjects in a white Honda Accord, two white males, subject is a signal-20"[1] near the Victory Bowling Lanes at Victory Drive and Skidaway Road. She also conveyed that the caller was following the Honda in a white van. Ms. Gibbons continuously relayed information concerning the vehicle's location to the officers responding to the call as she received it.

Officer Alan Arflin was nearing the end of his shift and returning to his precinct on June 24, 2006 when he heard the dispatcher's broadcast over his patrol car's radio. As Officer Arflin traveled along Victory Drive, he observed the suspect vehicle and turned his patrol car around, activated his emergency equipment, and initiated a stop of the Honda. Using his patrol car's public address system, Officer Arflin directed the occupants to

---

[1] A "signal-20" indicates that a suspect is in possession of a firearm.

remain in the vehicle and place their hands on the car. The occupants, however, exited the car with their hands in the air. Officer Arflin then exited his vehicle as well. When a back-up unit arrived on the scene, Officer Arflin conducted a weapons pat-down on the driver while another officer frisked the passenger (defendant Wehrle). Neither individual had a weapon on his person. As he looked through the Honda's windows Officer Arflin noticed a long firearm lying in the rear floorboard of the vehicle, with the butt of the gun on the driver's side and the barrel on the passenger's side. He then placed defendant and the driver into the back of separate patrol cars so that he could safely retrieve the firearm. Officer Arflin determined that the firearm was a 12-gauge shotgun with a pistol grip and a sawed-off barrel that appeared to be shorter than permitted by law. The officer then handcuffed defendant and the Honda's driver and placed them in the back of his patrol car. A subsequent search of the vehicle uncovered fired and unfired shotgun shells, opened and unopened cans of beer, and a metal pipe containing suspected crack cocaine.

## II.   STANDING

As a threshold matter, the government contends that defendant lacks standing to assert a violation of his Fourth Amendment rights since he was merely a passenger in the stopped car and denied ownership of the seized items. Doc. 24. Defendant, however, is not contending that the search of the vehicle was illegal per se, but rather that he was "aggrieved by an illegal stop" of the vehicle he was lawfully occupying and that any evidence obtained solely as a result of that unlawful stop must be suppressed. Doc. 12, at 3.

"Whereas the search of an automobile does not implicate a passenger's fourth amendment rights, a stop results in the seizure of the passenger and driver alike. Thus, a passenger of a stopped automobile does have standing to challenge the seizure as unconstitutional." United States v. Roberson, 6 F.3d 1088, 1091 (5th Cir. 1993) (footnote omitted). While neither the Supreme Court nor the Eleventh Circuit have explicitly so held, a number of circuit courts of appeals have similarly concluded that a passenger has standing to challenge the initial stop of a vehicle even if he cannot independently challenge its search, for his own liberty interests are

implicated by an unlawful stop. See United States v. Woodrum, 202 F.3d 1, 5-6 (1st Cir. 2000); United States v. Kimball, 25 F.3d 1, 5 (1st Cir. 1994); United States v. Rusher, 966 F.2d 868, 874 n.4 (4th Cir. 1992); United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); United States v. Powell, 929 F.2d 1190, 1195 (7th Cir. 1991); United States v. Ameling, 328 F.3d 443, 446 n.3 (8th Cir. 2003); United States v. Green, 275 F.3d 694, 698-99 (8th Cir. 2002); United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001); United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Eylicio-Montoya, 70 F.3d 1158, 1164 (10th Cir. 1995); United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992); United States v. Erwin, 875 F.2d 268, 269-70 (10th Cir. 1989). See 6 Wayne R. LaFave, Search and Seizure § 11.3(e) at 194 (4th ed. 2004). The Court finds the reasoning of these courts persuasive and concludes that defendant has standing to challenge the unreasonable seizure of his person and any fruits of that illegality under the Fourth Amendment.[2]

---

[2]The government contends that Rakas v. Illinois, 439 U.S. 128 (1978), requires the Court to find that defendant lacks standing to challenge the stop of the automobile. Doc. 24. In that case, however, the petitioners did not challenge the constitutionality of the stop of the vehicle in which they were riding but rather challenged only the subsequent search of the vehicle. Rakas, 439 U.S. at 150-51 (Powell, J., concurring). Thus, Rakas does not apply to the instant case, where defendant is challenging the initial stop of the vehicle. Moreover, Rakas does not prevent a passenger in an automobile from

## III. FOURTH AMENDMENT VIOLATION

Under Terry v. Ohio, 392 U.S. 1 (1968), an officer may stop and briefly detain an individual in order to investigate a reasonable suspicion that he is engaged in, or has been engaged in, criminal activity. In evaluating whether such reasonable suspicion exists, the court is to determine whether the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21; Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). Reasonable suspicion requires less than proof of wrongdoing by a preponderance of the evidence, or probable cause that evidence of a crime will be found, but more than an "inchoate and unparticularlized hunch" of wrongdoing. Terry, 392 U.S. at 30; United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995); United States v. Diaz Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993). The officer

---

challenging the legality of the initial stop of the vehicle in which he was riding. See 6 LaFave, Search and Seizure § 11.3(e) at 194 (noting that 6 members of the Rakas Court (2 concurring and 4 dissenting justices) recognized that a passenger does have standing to challenge a vehicle stop as an unreasonable seizure of his person).

must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop. United States v. Sokolow, 490 U.S. 1, 7-8 (1989); United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983). A reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior. United States v. Cortez, 449 U.S. 411, 418 (1981).

Defendant contends in his post-hearing brief that the Court may not consider facts known only by a 911 dispatcher in evaluating whether reasonable suspicion existed to justify the Terry stop of the vehicle. Doc. 29. Defendant argues that Ms. Gibbons' knowledge cannot be imputed to Officer Arflin since she was a civilian 911 operator who lacked the necessary training to make probable cause or reasonable suspicion determinations. Id. The government contends that under the collective knowledge doctrine, the Court may properly consider the information known to the 911 dispatcher in gauging whether the arresting officer complied with the Fourth Amendment. Doc. 31.

The collective knowledge doctrine permits officers to conduct a Terry stop when information sufficient for reasonable suspicion is not known by the officers themselves but is known to other law enforcement officials involved with the investigation. Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983); United States v. Colon 250 F.3d 130, 135 (2d Cir. 2001); see United States v. Hensley, 469 U.S. 221, 230-33 (1985); Moreno-Vallejo v. United States, 414 F.2d 901, 904 (5th Cir. 1969). While the Eleventh Circuit has not decided whether the information possessed by a 911 operator/dispatcher is considered part of the collective knowledge of officers responding to a scene, the majority of circuits that have addressed the issue have held that it is. See United States v. Fernandez-Castillo, 324 F.3d 1114, 1118 (9th Cir. 2003) (under the collective knowledge doctrine, the dispatcher's knowledge is properly considered as part of the reasonable suspicion analysis even though the dispatcher "distilled and paraphrased" the information before relaying it to the arresting officer); United States v. Kaplansky, 42 F.3d 320, 327 (6th Cir. 1994) ("where officers are told to investigate a situation without being told all of the facts justifying investigation, the court must look beyond the specific facts known to the officers on the scene to the facts

9

known by the dispatcher"); United States v. Cutchin, 956 F.2d 1216, 1217-18 (D.C. Cir. 1992) (reasonable suspicion for a Terry stop "can be supplied on the basis of a 911 call alone if it has sufficient indicia of reliability. . . . [I]f so, a dispatcher may alert other officers by radio, who may then rely on the report . . . even though they cannot vouch for it.") (citations omitted). In one instance, even though the officers were unaware that a dispatcher's knowledge came from an anonymous tipster who offered no evidence of reliability, the Sixth Circuit imputed the dispatcher's knowledge that the tip was anonymous to the officers and found that the officers lacked reasonable suspicion to conduct a Terry stop. Feathers v. Aey, 319 F.3d 843, 849 (6th Cir. 2003). The Second Circuit, however, has taken a different approach, holding that a civilian 911 operator's knowledge could not be imputed to a police dispatcher or the arresting officers "because the operator lacked the training to assess the information in terms of reasonable suspicion, and the operator failed to convey sufficient information from which the dispatcher, a law enforcement officer, could have concluded that a stop and frisk could be ordered, or from which the arresting officers could have concluded that a stop and frisk was

appropriate." Colon, 250 F.3d at 138.  Thus, the Second Circuit interprets the collective knowledge doctrine as applying only to law enforcement officials trained in assessing probable cause or reasonable suspicion, excluding even a police department dispatcher who lacks such training.[3]

The Eleventh Circuit has emphasized the importance of 911 calls in communicating emergency situations to law enforcement officials. United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir. 2002) ("Not surprisingly, 911 calls are the predominant means of communicating emergency situations."). The court explained that "[s]uch calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior." Id.  In the instant case, Ms. Gibbons received a late-night call from a concerned citizen reporting an incident that he had just witnessed in a parking lot.  This call, like the calls described in Holloway, relayed the caller's concern about an ongoing situation requiring an immediate

---

[3]The Second Circuit's approach would lead to this curious result: where a civilian 911 operator receives a non-anonymous tip furnishing reasonable suspicion of criminal activity but neglects to inform the police that the tipster's identity is known, suppression is required because the 911 operator's knowledge that the tipster is not anonymous *can't be imputed* to the police; Colon, 250 F.3d at 137; conversely, where a dispatcher receives a tip from an anonymous caller but the police believe that the report of criminal activity is from a known tipster, suppression is required because the dispatcher's knowledge *must be imputed* to the police. See Feathers, 319 F.3d at 849.

11

investigatory response. Furthermore, unlike the 911 operator in Colon, who lacked any specialized law enforcement training,[4] 250 F.3d at 136-37, the government established that Ms. Gibbons had spent two of her ten years with the Savannah police department as a Community Services Specialist charged with responding to police calls (where no danger was involved), interviewing witnesses, and preparing official reports. In light of these considerations, the Court finds persuasive those cases that hold that the information known to a 911 dispatcher is imputed to the responding officer in analyzing whether reasonable suspicion exists to justify a Terry stop. Accordingly, the Court concludes that the information known to Ms. Gibbons through her communication with Mr. Kirby is properly imputed to Officer Arflin and considered as part of the reasonable suspicion calculation.[5]

---

[4]The Colon court distinguished a state case involving an "auxiliary police officer" who, unlike the civilian 911 operator in Colon, had undergone a 52-hour course in "'police science, *criminal law*, self-defense, first aid, *police procedure* and crowd psychology.'" 250 F.3d at 137 (citation omitted) (emphasis in original). Based on the nature of Ms. Gibbons' many years of experience and her prior work as an investigator in the field, she seems much more akin to an "auxiliary" police officer than to a mere "civilian" 911 operator with no police training. Id. at 133, 137. Thus, it is not clear that even the Colon court would decline to impute Ms. Gibbons' knowledge to the arresting officers under the collective knowledge doctrine.

[5]Defendant also contends that under Florida v. J.L., 529 U.S. 266 (2000), the witnesses were mere tipsters and the police were not entitled to rely on the phone call

Considering the information furnished by the 911 caller, the police possessed enough information to warrant the stop and brief detention of defendant and the driver of the white Honda Accord. Ms. Gibbons received a late-night citizen report that a white male had just stepped out of a vehicle with a firearm in a Kroger parking lot located in a high crime area of Savannah.[6] The caller stated that the individual had not brandished the weapon at anyone but had reentered the vehicle and was driving away. The witness reported that before the vehicle exited the parking lot, one of the

---

from them to establish reasonable suspicion. Doc. 29. In J.L., the Supreme Court held that an anonymous tip lacking any indicia of reliability cannot provide an officer with sufficient reasonable suspicion of criminal activity to justify a Terry stop and frisk. Id. at 266. One of the Court's primary justifications for not allowing such uncorroborated, anonymous tips to establish probable cause is that the anonymous informant cannot be held responsible if the information is determined to be fabricated. Id. at 270. In this respect, a crucial difference exists between the instant case and J.L.. The "tipsters" in the instant case were not anonymous. Although they did not provide their names to the 911 operator, they informed her of their location, described their vehicle, and responded that they were following the Honda. These witnesses then pulled over and provided the officers on the scene with a further statement regarding what they had observed. Thus, the witnesses made themselves known all along rather than hiding behind a veil of anonymity, thereby subjecting themselves to possible repercussions if their allegations were found to be false. The officers, therefore, were not relying on an anonymous tip as contemplated by the Court in J.L., and they were entitled to rely on the information provided by the witness in assessing reasonable suspicion for the stop.

[6]The reputation of an area for criminal activity is a factor that may be considered when determining whether reasonable suspicion exists. Wardlow, 528 U.S. at 124; United States v. Gordon, 231 F.3d 750, 755-56 (11th Cir. 2000).

occupants got out of the car and urinated in public.[7] Mr. Kirby and his wife were clearly concerned about the intentions of the individuals in the vehicle, for they followed the vehicle as it left the parking lot and continually informed Ms. Gibbons of the vehicle's location and other details. Significantly, Mr. Kirby informed the dispatcher that the driver had removed his shirt at an intersection and that, after noticing the Kirby's vehicle following him, had driven through the parking lot of a bowling alley in an apparent attempt to lose them. The Court finds that these facts, taken together, created a reasonable suspicion of criminal activity and justified Officer Arflin's stop of the vehicle.

But even if the Court considers only those facts actually relayed to Officer Arflin, he possessed reasonable suspicion to justify the stop of the Honda. Officer Arflin heard the dispatch communication around midnight that two individuals in possession of a firearm were traveling in an automobile near Victory Drive and Skidaway Road, an area of Savannah

---

[7]Public urination is a violation of Georgia's public indecency statute, O.C.G.A. § 16-6-8. See Clark v. State, 313 S.E.2d 748, 750 (Ga. App. 1984). Public urination is also specifically prohibited by ordinance within the City of Savannah. See Savannah Code of Ordinances, Part 9, Chapter 1, §9-1002 (available at http://www.municode.com/resources/gateway.asp?pid=11556&sid=10) (last accessed January 19, 2007).

known for criminal activity. He also knew that the citizens who reported this incident were following the vehicle and continually updating the dispatch operator as to its location. These facts alone establish a reasonable suspicion of criminal activity.[8] Therefore, Officer Arflin was justified in stopping the vehicle based solely on the information known to him.

## IV. CONCLUSION

As a passenger in an automobile, defendant was seized within the meaning of the Fourth Amendment when Officer Arflin initiated a stop on the vehicle in which he was riding. Thus, defendant has standing to contest the validity of that stop. But given the information provided by the witness in the 911 call, the lateness of the hour, and the character of the neighborhood where the events occurred, the police had reasonable grounds to believe that criminal activity was afoot and were justified in effectuating

---

[8] See Illinois v. Wardlow, 528 U.S. 119 (2000) (pedestrian's unprovoked flight from officers in area of heavy narcotics trafficking supported reasonable suspicion that defendant was involved in criminal activity and justified Terry stop). The basis for a reasonable suspicion finding is arguably stronger here than in Wardlow, which found Wardlow's sudden flight at the sight of the police to be sufficiently suspicious to justify his stop given his presence in a high crime area. Here, the defendant was seen *with a gun* late at night in a high crime area. This information, which was known to the arresting officer, justified a further investigation.

a stop of the vehicle in order to confirm or dispel their suspicions. Accordingly, the stop of the Honda was proper and the evidence collected during the subsequent search of the vehicle was lawfully obtained. Defendant's motion to suppress should be DENIED.

**SO REPORTED AND RECOMMENDED** this 29Th day of **January, 2007.**

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA